**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| RICHARD M. POWELL,<br>LARRY A. CLEMENTS, and<br>BELINDA STEPHENS, | ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | CV-09-RRA-1616-S |
| | ) | |
| CHARLES GORHAM, L. STEPHEN<br>WRIGHT, GEORGE FERNAMBUCQ,<br>RICHARD VINCENT, former<br>JUDGE JOHN CALHOUN,<br>JUDGE R. A. FERGUSON,<br>and the law firms of  GORHAM &<br>CASON and BOYD, FERNAMBUCQ<br>& VINCENT, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This civil action is filed by the plaintiffs, Richard M. Powell, Larry A. Clements, and

Belinda Stephens, on behalf of themselves and as representatives of a purported class of

similarly situated plaintiffs.  This action was originally brought against Charles Gorham; the

law firm of Gorham & Cason, L.L.C.; L. Stephen Wright; the law firm of Najjar, Denaburg,

P.C.; George Fernambucq; Richard Vincent; the law firm of Fernambucq & Vincent, P.C.;

and John C. Calhoun and R. A. Ferguson.  On September 13, 2009, the plaintiffs voluntarily

dismissed, without prejudice, all defendants except for defendants Calhoun and Ferguson.

(Doc. 30).  This case now comes before the court on defendant Ferguson's motion to dismiss

or, in the alternative, for judgment on the pleadings and on defendant Calhoun's  motion to

dismiss.  (Docs. 25 and 43).

The plaintiffs clearly claim that the defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.  Although the complaint also alleges fraud and misrepresentation, it is uncertain from the pleadings whether such allegations are intended to be separate legal claims or are merely alleged predicate RICO acts.  In either event, the court's analysis is the same.

STANDARD FOR MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS

The test for a Rule 12 (b) (6) motion to dismiss is set out in *Pittman v. Marshall*:

> A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). A complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1965 (2007).  Factual allegations in a complaint need not be detailed but "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 1964-65 (citations omitted); *see also Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (stating that the court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff). The court does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S.Ct. at 1974.

*Pittman v. Marshall*, No. 2:06-cv-0507-WKW, 2007 WL 3049563, *2 (M.D. Ala. Oct. 18, 2007).

The standard is essentially the same for a judgment on the pleadings under Rule 12(c). *See Cunningham v. District Attorney's Office for Escambia County*, 592 F.3d 1237, 1255 (11th Cir. 2010) ("'Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the

pleadings and any judicially noticed facts.'  We accept all the facts in the complaint as true and view them in the light most favorable to the nonmoving party.").[1]

## ALLEGATIONS

The only remaining defendants in this case are John Calhoun, a former Jefferson County Circuit Court judge, and R.A. Ferguson, a current Jefferson County Circuit Court judge. The seventy-eight page complaint makes numerous allegations that Calhoun, Ferguson, and others engaged in an illegal scheme whereby lawyers would provide Calhoun and Ferguson with free memberships in clubs and other benefits, in exchange for favorable rulings and awards of attorney's fees.  The following is a summary of the pertinent allegations.

In 1993, before his judicial nomination and appointment, Calhoun reached "an understanding and agreement" with the conspiring attorneys whereby the lawyers agreed "to support Calhoun's nomination for a vacant domestic relations judgeship in Alabama's Tenth Judicial Circuit, provide future reelection financial support, and in the future share their illegal Enterprise profits with Calhoun."  (Doc. 1, p. 31).  Calhoun "agreed that he would give said Known and Unknown Defendant Attorneys and Nomination Committee Lawyers preferred treatment in his court.  Such conspiracy and subsequent actions of all the foregoing included grant of better outcomes for their clients and inflated, champertous legal fees; in more current vernacular, 'pay for play'."  (Doc. 1, pp. 31-32).  Moreover, Calhoun, along with other persons, was a controlling member of a hunting club ("the Club").

---

[1]As the court did not consider any evidence in ruling on these motions, the plaintiffs' motion in limine (doc. 48) is DENIED as moot.

3

After Calhoun received the appointment to office, he and Ferguson received or continued to receive, free of charge, privileges at the Club, as well as campaign contributions from the participating attorneys. Calhoun and Ferguson also agreed with the co-conspirators to allow contingent attorneys' fees, which are prohibited in domestic relations cases. The involved attorneys shared these fees with Calhoun and Ferguson. (Doc. 1, p. 11). Further, the complaint alleges that the conspiring attorneys, when they represented parties against whom improper fees were assessed, would not object. After Calhoun was defeated in the 2006 elections by Suzanne Childers, who was not part of the conspiracy, Ferguson participated in the "fraudulent administrative transfer and exclusion of" co-conspirator attorneys' cases from the docket of Judge Childers. (Doc. 1, p. 13).

The complaint contends that Calhoun and Ferguson were disqualified from hearing the cases of those attorneys with whom they had entered into the illegal agreements. (Doc. 1. p. 13-17). Calhoun and Ferguson violated their duty to perform their jobs honestly and to inform the parties that they had pecuniary interests in the outcome of the cases they would be deciding. (Doc. 1, p. 17-18). The complaint also alleges that the Club benefits received by Calhoun and Ferguson should have been, but were not reported on judicial financial disclosure statements. (Doc. 1, p. 18-19).

Specifically, each of the plaintiffs states as follows:

### Representative Plaintiff Clements

33. At the beginning of Clements' case in 2006, both Gorham and Calhoun failed and refused to make required full disclosure of their respective conflicts of interest to Mr. or Mrs. Clements and failed and refused to disclose the necessary and substantially adverse impact such conflicts

4

had on the legitimacy and validity of any orders coming out of the case. (See infra, ¶78 et seq)

34.  Clements paid Gorham legal fees and costs in excess of $25,000 [in exchange] for a valid divorce decree and for honest legal services which Clements did not receive, lost well in excess of $100,000 in property and income as a result of the void or voidable Calhoun judgment, and unnecessarily incurred and wasted over $15,000 in post-judgment legal fees based on a wholly inadequate, incomplete appellate record due to said Defendants' misrepresentations and failure to disclose on the court record.  These injuries were proximately caused by the predicate acts of all Defendants as described herein. ($140,000+ in injuries).

Mr. and  Mrs. Toler — Class Members

35.  In September, 1994, Robert Toler paid Fernambucq a $10,000 retainer [in exchange] for honest services and a valid divorce decree which Toler did not receive.  During the litigation Toler paid Fernambucq an additional $20,000, other costs of $12,000, and paid over $45,000 in appellate and other postjudgment attorneys' fees (based on a wholly inadequate and incomplete appellate record caused by nondisclosure and suppression of facts on the record), all damages proximately caused by the predicate acts of all Defendants as described herein.

36.  At the conclusion of his case, Toler (husband) was ordered by Calhoun to pay $7,300 additional contingent legal fees to Gorham as Ms. Toler's attorney; Gorham's client contracts provided that his clients, such as Ms. Toler, did not receive credit for any such contingent, additional fees ordered to be paid by the court (Calhoun) and that the full contract legal fee was still payable to Gorham by the client, Ms. Toler, i.e. contractually the entire $7,300 would go directly into Gorham's pocket; such a contract constituted a fraud on Ms. Toler as well as on the court and its equitable judicial processes. ($87,000 + $7,300 in injuries to property + over $100,000 injury to Toler's business).

37.  Calhoun did not recuse himself and neither Fernambucq nor Gorham withdrew from the Toler case as mandated by Alabama law and due process and they knowingly suppressed and misrepresented their conflicts of interest.

38.  In May, 2004, Mr. Toler's separate child custody case and defendants' related deceit as the result of nondisclosure of material conflicts of interest by Gorham and Calhoun began and continued through date of

issuance of an opinion; Calhoun peremptorily entered a favorable judgment for Gorham's client in what the appellate court later referred to as "entry of a favorable judgment before the close of the presentation of all of the evidence" thereby "pretermitting the father's [Toler's] claim without hearing." (Issuance of an Order is a Predicate act, even though judicial conduct and immune as to Calhoun's and/or Ferguson's civil liability).

39.   Upon remand in early Fall, 2006, Calhoun ruled for Mr. Toler solely because Calhoun was opposed in his November, 2006, reelection and Mr. Toler worked actively for Calhoun's opponent.  Yet, in prohibited, ex parte undisclosed communications in furtherance of the Enterprise Calhoun assured Gorham that Calhoun would reverse the Order in favor of Gorham's client, Ms. Toler, immediately upon being reelected. This  clearly constituted fraud on Ms. Toler, Mr. Toler, the child, the judicial process, and fraud on Alabama election processes.

40.   Pursuant to Alabama Canons of Judicial Ethics (statutory law in Alabama) the only way for Calhoun to have such conflicts of interest waived in the Toler, Clement, Stephens, and Plaintiff Class cases is to have made a full disclosure of his conflicts of interest and his disqualification on the record prior to accepting the case and thereafter obtained a written waiver of the conflicts signed by all counsel and by all parties; no such disclosure was made and no such written waiver of conflicts was ever obtained or placed in the record of Toler, Clements, Stephens or any case during Calhoun's or Ferguson's tenure.

Representative Plaintiff Richard M Powell

41.   Representative plaintiff Richard M Powell (hereinafter "Powell") filed a motion for modification of alimony before Ferguson on May 21, 2009.  Neither Ferguson nor coconspirator attorney representing defendant party Ms. Powell informed either party that Ferguson was a disqualified judge due to his racketeering conspiracy.

42.   Ferguson ruled on the motion on June 8, 2009. Ferguson fraudulently granted coconspirator attorney for Defendant Powell's wife an inflated attorney fee to be paid by Powell directly to the attorney of $12,500. With no required pretrial discovery hearing or record as mandated by Alabama law and with no jurisdiction under Alabama law including Alabama Rules of Civil Procedure to do so, Ferguson fraudulently awarded coconspirator attorney for Defendant Powell's former wife a discovery "sanction" of $12,500. Ferguson, without jurisdiction,

fraudulently ordered such sanction payable by Mr. Powell directly to the defendant's coconspirator attorney and not to the party in interest, defendant Ms. Powell, as the supposedly wronged party. Sanctions under federal or state rules are paid to the party in interest but are used by Ferguson and the Enterprise to illegally inflate conspiring attorneys' incomes wholly without basis or notice and constituted a violation of due process. . . .

43.   Ferguson's June 8, 2009, award of the sanction and its payment directly to the coconspirator defendant's attorney on behalf of the Enterprise violated the right to honest services owed to Powell and Powell's former wife as parties to the action and was wholly without jurisdiction in Ferguson.  (Hobbs Act, Travel Act violations, Money Laundering and Monetary Transaction violations; mail and wire fraud, including loss of honest services fraud, with particularity as to who, what, and when).

Representative Plaintiff Belinda Stevens and Her Then Minor Children John Stevens, Michael Stevens and Anthony Stevens

44.   Representative plaintiff Belinda Stephens (hereinafter Stephens) has resided in Sylva, NC, for over 10 years and travels interstate to appear before Jefferson County's domestic relations courts.

45.   Stephens' 1998 divorce, child custody, and child support case had been heard by John Calhoun and was subject to the continuing jurisdiction in the court of Judge Suzanne Childers who replaced Calhoun effective January 1, 2007.

46.   At the beginning of Ms. Stephens case in 1998, during the case, and thereafter, Calhoun and Wright did not inform either party of their longstanding personal and financial interrelationship, the resulting disqualification of Calhoun as judge, nor any details of their racketeering conspiracy and its adverse implications on the validity of any judgment or order issued by Calhoun.

47.   In 1998, Stephens lost over $100,000 in money and property as the proximate result of Calhoun's, Known and Unknown Attorney Defendants', Nomination Committee lawyers', and Unknown Coconspirators, Aiders, and Abettors' predicate acts of sale of Calhoun's office, Travel Act violations, money laundering, monetary transactions, and mail and wire fraud.

7

48. Ms. Stephens had seven (7) children born during the marriage that she cared for at home and she could not and did not work outside the home. She not only lacked formal work experience outside the home, but lacked a formal higher education.

49. In October, 2004, a hearing was held before Calhoun to modify the divorce order to require that her affluent, multimillionaire husband pay for the college education of Ms. Stephens' triplets who were still minors.

50. Ms. Stephens arrived at court to discover Calhoun as judge engaged in an ex parte conference with Wright, Wright's defendant client Mr. Stephens, and Mr. Stephens' new wife, with whom he'd admittedly had a long-time affair during his marriage to Ms. Stephens. Calhoun refused to apprise Ms. Stephens or her attorney of the matters discussed at length ex parte.

51. The trial was as unfair and biased as the ex parte pretrial conference among Wright, Calhoun, and the defendant parties had assured. Calhoun threatened Ms. Stephens, a mother of seven (7), saying he would "throw [her] ass in jail" merely as the result of a simple question to her lawyer.

52. Ms. Stephens' lawyer, after observing Calhoun's openly hostile, clearly partial conduct and after being threatened by Calhoun, advised Ms. Stephens to withdraw her motion because Calhoun intended to take away what little child support she was receiving if she did not withdraw the motion.

53. As the direct proximate result of failure to disclose their disqualifying relationship and Calhoun's and Wright's other predicate acts in furtherance of the Enterprise's illegal goals, the Stephens triplets, John, Michael and Anthony, each as minors, lost more than $75,000 in money and property as legally mandated support necessary for them to complete their high school and college educations.

54. As the direct proximate result of failure to disclose their disqualifying relationship and Calhoun's and Wright's other predicate acts in furtherance of the Enterprise's illegal goals, Ms. Stephens put herself inextricably in debt to provide her children with their legal right under Alabama law to a high school and college education. As a direct result of Calhoun's and Wright's predicate acts in furtherance of the Enterprise's illegal goals Ms. Stephens is losing her and the childrens'

8

[sic] home due to foreclosure in August, 2009, at the time of filing this action. The loss proximately caused to Ms. Stephens by the Enterprise and predicate acts of stated defendants is in excess of $250,000 in money and property.

55.    In 2006, Ms. Stephens again filed a motion on behalf of herself and her children for high school and college support education costs. Judge Childers was not a member of or coconspirator with the Enterprise and had not continued Calhoun's, Ferguson's, or other Enterprise coconspirators' biased rulings or grant of inflated illegal attorneys' fees.

56.    Ferguson, Nomination Committee lawyers, and Known and Unknown Attorneys successfully conspired and took action with other coconspirator judge(s) to have all such lawyers' cases transferred to such conspiring judges and away from nonconspirator Judge Childers.

(Doc. 1, pp. 8-29) (footnotes omitted).

<u>ANALYSIS</u>

The question presented to the court is whether Ferguson and Calhoun are entitled to judicial immunity on any or all of the alleged illegal acts. Wherever judicial immunity applies, the plaintiffs' claims must fail.

"[J]udicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Mireles v. Waco*, 502 U.S. 9, 11, 112 S.Ct. 286, 288, 116 L.Ed.2d 9 (1991). A judge is entitled to absolute immunity for any acts that are within the function of the judicial office and loses immunity only if the claimed acts are wholly outside his jurisdiction as a judge. *See Stump v. Sparkman*, 435 U.S. 349, 356-57, 362, 98 S.Ct. 1099, 1105, 1107, 55 L.Ed.2d 331 (1978) ("A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." (internal quotation marks omitted)); *Sibley v. Lando*, 437 F.3d 1067, 1070 (11th Cir. 2005). In applying this rule, "the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump*, 435 U.S. at 356, 98 S.Ct. at 1105. Noting that a judge acting "in excess" of his jurisdiction is still entitled to judicial immunity, the Supreme Court gave the following example:

if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of

9

> jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune.

*Id.* at 356 n. 7, 98 S.Ct. at 1105 n. 7.

*Lloyd v. Foster*, No. 08-11253, 2008 WL 4737438, *4 (11th Cir. October 20, 2008). even corrupt judicial acts, are given judicial immunity. *See Wilson v. Bush*, 196 Fed. Appx. 796, 799 (11th Cir. 2006) ("Entering a judgment or order is a quintessential judicial function and immunity attaches to it. 'This immunity applies even when the judge is accused of acting corruptly.'")

The complaint clearly alleges that the plaintiffs were injured as a direct result of orders issued by the defendants. Plaintiff Clements alleges that he "lost well in excess of $100,000 in property and income as a result of the void or voidable Calhoun judgment, and unnecessarily incurred and wasted over $15,000 in post-judgment legal fees based on a wholly inadequate, incomplete appellate record due to said Defendants' misrepresentations and failure to disclose on the court record." (Doc. 1, p. 20). Plaintiff Powell states that "Ferguson fraudulently granted an inflated attorney fee to be paid by Powell directly to the attorney of $12,500 and fraudulently awarded a discovery 'sanction' of $12,500." (Doc. 1, pp. 23-24). Plaintiff Stevens alleges that when she filed a motion asking for her ex-husband to pay for college for their minor children, Calhoun openly threatened her with jail and the withdrawal of current support payments. (Doc. 1, pp. 23-29).

The Tolers allege that

> [a]t the conclusion of his case, Toler (husband) was ordered by Calhoun to pay $7,300 additional contingent legal fees to Gorham as Ms. Toler's attorney; . . . In May, 2004

10

> . . . Calhoun peremptorily entered a favorable judgment for Gorham's client . . . .
> Upon remand in early Fall, 2006, Calhoun ruled for Mr. Toler solely because Calhoun
> was opposed in his November, 2006, reelection and Mr. Toler worked actively for
> Calhoun's opponent.  Yet, in prohibited, ex parte undisclosed communications in
> furtherance of the Enterprise Calhoun assured Gorham that Calhoun would reverse
> the Order in favor of Gorham's client, Ms. Toler, immediately upon being reelected.
> This clearly constituted fraud on Ms. Toler, Mr. Toler, the child, the judicial process,
> and fraud on Alabama election processes.

(Doc. 1, pp. 21-23).[2]  Stevens further asserts that in 2006,  after Calhoun had been replaced

by a new judge who was not part of the alleged conspiracy, she, Stevens, filed a second

petition in 2006 for the same relief.   Ferguson, however, conspired to have the case

transferred from the new judge to "conspiring judges." (Doc. 1, p. 29).

The plaintiffs first argue that judicial immunity does not apply in this case because the

plaintiffs' injuries, it is alleged, stem not only from judicial conduct, but from non-judicial acts

--- administrative acts or predicate acts --- of the defendants.  The complaint states:

> Plaintiffs have pled many predicate acts occurring over numerous years which
> "proximately caused" injury.   These nonimmune acts more than satisfy the RICO
> "standing" requirement. Such predicates acts were taken as merely nonimmune
> administrative and private nonjudicial actions, e.g. (1) nonimmune scheduling of
> dockets (Ferguson), (2) nonimmune failure to file required reports to the Ethics
> Commission(Ferguson and Calhoun), (3) separate nonimmune annual filings of
> incomplete financial statements required of many Alabama public officials, including
> judges (Ferguson [each year 1993-2009] and Calhoun [each year 1993-2006]),(4)
> nonimmune Hobbs Act violations as a "private citizen" before becoming a judge
> (Calhoun), (5) nonimmune predicate acts related to mediation and/or arbitration
> including money laundering after being removed from office (Calhoun); (6) wholly
> private nonimmune acts including money laundering, monetary transactions, and
> Travel Act violations (Ferguson and Calhoun - numerous separate acts each).

(Doc. 40, p. 7).  Second, the plaintiffs argue that, even as to the defendants' judicial conduct,

the judges in this case acted in the "absence of jurisdiction" voiding their judicial immunity."

---

[2]  The Tolers' claims are stated in the complaint as representative-of-class claims.  Still, the
Tolers' damages arise from orders issued by Calhoun when he was a judge.

In support of their first argument, the plaintiffs cite *Cox v. Administrator U.S. Steel &*

*Carnegie*, 17  F.3d 1386 (11th Cir. 1994), a civil RICO case, wherein

> Plaintiffs-appellees, who are or were Union members and employees at the Fairfield Works, brought this suit against USX, the administrator of the United States Steel and Carnegie Pension Fund ("the Fund"), and the Union, alleg[ed] that the Union negotiators covertly requested and received pension benefits from the Company to which they were not entitled and that, as a result, the Union negotiators agreed to concessions that damaged the plaintiffs.

*Cox*, 17 F.3d at 1392-1393. The district court granted summary judgment on behalf of the

defendants.

> In light of the undisputed evidence that the FWA never changed after USX promised to consider the pension issue, the jury could not reasonably infer that USX's promise influenced the negotiators to make concessions in the FWA.
>
> More importantly, in view of the additional undisputed evidence that the concessions resulted from the need to make the Fairfield Works profitable before it was reopened, the jury could not soundly infer that it was more likely that the concessions resulted from the bribery of Union officials than from economic necessity.

*Id.* at 1399.

The Eleventh Circuit stated:

> We begin our analysis by observing that the plaintiffs need not prove that the matter involving the personal pension benefits caused all of the concessions in the Agreement, or that the prevailing economic conditions had no effect on the negotiations. It is well-established that RICO plaintiffs must prove proximate causation in order to recover. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, ---- - ----, 112 S.Ct. 1311, 1317-18, 117 L.Ed.2d 532 (1992); *see also Reverend Father O'Malley v. Reverend Father O'Neill*, 887 F.2d 1557, 1561 (11th Cir.1989). In other words, "[c]ausation principles generally applicable to tort liability must be considered applicable" in RICO cases. *Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir.1988). A proximate cause is not, however, the same thing as a sole cause. Instead, a factor is a proximate cause if it is "a substantial factor in the sequence of responsible causation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir.1990). It is beside the point whether the depressed condition of the steel industry also contributed to the concessions. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41, at 268 (5th ed. 1984) ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be

absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present.")

Moreover, there were many different concessions worth varying amounts in the Agreement. The proximate cause question is whether Rich and Phillips' pursuit of the pensions was responsible for changing the amount of any concessions to which the Union agreed, not whether it was responsible for the Union's having to make any concessions in the first place or most of the concessions in the final analysis. For example, if the Agreement cost the Union membership X million dollars in total concessions, but would have cost only X million minus 100,000 dollars in concessions but for the personal pension matter, then that matter caused the membership 100,000 dollars in injury. The district court appears to have recognized as much, noting that "[p]laintiffs' return to work under less favorable conditions constituted an injury to their business or property sufficient to satisfy RICO requirements, if plaintiffs could show they would have returned to work under a less concessionary agreement absent the RICO violations." We agree with that proposition.

To avoid summary judgment, therefore, the plaintiffs must point to evidence from which a reasonable jury could infer that Rich and Phillips' pursuit of pensions for themselves and their friends caused some part of the total dollar amount of concessions in the Fairfield Works Agreement. The district court concluded that "the jury could not reasonably infer that USX's promise influenced the negotiators to make concessions in the FWA," because any deal on the pensions came after the Agreement was in final form (although before it was signed). The court seems to have assumed that the plaintiffs must prove that USX's ultimate agreement to provide the pension benefits caused the concessions. However, the mere request for unearned pension benefits constituted a violation of 29 U.S.C.A. § 186(b) and therefore was racketeering activity under 18 U.S.C. § 1961(1)(C). That request, it will be recalled, was first made early in the course of the negotiations. Accordingly, the element of causation is satisfied if the Union negotiators were influenced to make any amount or degree of concessions in the subsequent rounds of negotiations by their desire to convince the Company to agree to their outstanding illegal request coupled with the Company's failure to reject the pension request from the beginning.

*Id.* at 1399-1400.

*Cox* did not involve judicial immunity. Nevertheless, the plaintiffs before this court assert that there is a principle set out in *Cox* that applies to the pending case. The *Cox* plaintiffs claimed that their damages were the concessions made by the union negotiators. The *Cox* plaintiffs further claimed that those concessions were exchanged, at least in part, for the illegitimate personal pension benefits the union negotiators obtained for themselves. The

district court pointed out, however, that there were other possible <u>legitimate</u> causes for the concessions, such as prevailing economic conditions, and the court held, therefore,  that the plaintiffs could not show that it was more likely that the concessions resulted from bribery than from mere economic conditions. On appeal, the Eleventh Circuit pointed out that although RICO plaintiffs must prove proximate cause, proximate cause does not mean <u>sole</u> cause, rather proximate cause is defined as a substantial factor in the sequence of responsible causation. Thus, the appellate court held that the district court improperly limited the plaintiffs by requiring them to prove that the RICO violations had to be the sole or main cause of the concessions.

In the instant case, the plaintiffs argue that all of the causes of their damages should be considered, including the <u>non</u>-immune causes.  However, all of the damages to the plaintiffs at bar flowed directly from orders issued by the judges.  The other conduct cited by the plaintiff as being non-immune conduct, such as the scheduling of dockets, failing to file required reports to the Ethics Commission, alleged Hobbs Act violations prior to becoming a judge, acts relating to mediation or arbitration, and money laundering after leaving office, did not directly cause the alleged damages.[3]  The Eleventh Circuit held in *Cox* that the "pension benefits" and the "economic conditions" were on par with each other, that they were both <u>direct</u> causes of the concessions.  In the case before this court, there are direct and indirect causes.  The direct cause of the plaintiffs' damages were immune judicial orders, while

---

[3] One last instance of conduct is at issue, Ferguson's alleged conspiracy to manipulate the court's docket.  The plaintiff argues that there is no immunity for such actions.  However, the court need not reach that issue as the plaintiffs do not allege that damages occurred as a result. *See* Doc. 1 ¶ 56.

the other causes, such as the "predicate acts" mentioned above, were not direct causes of the plaintiffs' damages. The plaintiffs' reliance on *Cox* is misplaced.

Next, the plaintiffs' argument that the defendants did not have jurisdiction to issue the orders in this case is also without merit.  The Eleventh Circuit has held:

> "the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge."  *Stump*, 435 U.S. at 356, 98 S.Ct. at 1105.  Noting that a judge acting "in excess" of his jurisdiction is still entitled to judicial immunity, the Supreme Court gave the following example:
>
>> if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune.
>
> *Id.* at 356 n. 7, 98 S.Ct. at 1105 n. 7.

*Lloyd v. Foster*, No. 08-11253, 2008 WL 4737438, *4 (11th Cir. October 20, 2008).  The present case involves domestic relations judges issuing domestic relations orders, which clearly Calhoun and Ferguson had jurisdiction to do.

The plaintiffs also argue that judicial immunity provides immunity for money damages only, while the complaint seeks injunctive relief, costs, and attorneys fees.  However, "the doctrine of judicial immunity applies both  to actions for damages and suits seeking injunctive and declaratory relief."  *Bush v. Washington Mut. Bank,* 177 Fed. Appx. 16, 17 (11th Cir. 2006) (*citing Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000)).

In another case against defendant Calhoun, also filed in this district and based on similar facts, the district judged reached a similar conclusion.  In that case, *Blackburn v.*

*Calhoun*, CV-07-BAE-166-S, the plaintiff was Joseph Blackburn, who is plaintiffs' counsel in

the instant case.  On February 13, 2007, District Judge Edenfield stated:

> The story in this case begins in 1993. Doc. # 31-2 at 4 ¶ 8. Defendant John C.
> Calhoun was then nominated and later appointed as an Alabama state court judge. *Id.*
> For many years before that, Calhoun and "known attorney defendants" Charles
> Gorham, George Richard Fernambucq and L. Stephen Wright-in combination with
> "unknown defendants"-hunted and fished together as controlling members of a
> hunting club ("Hunting Club"). *Id.* ¶ 11. It was improper, Blackburn says, for Calhoun
> to continue as a member of that club while serving as a judge in these attorneys'
> domestic relations cases.  *Id.* ¶ 12.

> Worse, he continues, these men formed an "illegal Enterprise," and from 1993
> onward they "have continually used and invested their illegal Enterprise income into
> Enterprise [Hunting Club] land, improvements for hunting club roads, green fields,
> fencing, etc., and operating costs which collectively ranged upwards from
> approximately $50,000 annually." *Id.* ¶ 13 (footnote omitted).  The "enterprise"

> > consists of (a) an association in fact of the individual Defendants who
> > have a long and unique association with one another, thus making the
> > Enterprise distinct and separate from any individual defendant. See
> > *U.S. v. Perholtz*, 842 F.2d 343 (11th Cir.1988); (b) this association of
> > individuals is effected and maintained through the Hunting Club of
> > which many Defendants (10 dues paying Defendant Lawyers, 2
> > nondues paying circuit court judges, and 4 other nondues paying
> > members) are members, which is controlled by Defendants, and which
> > has an organizational structure; and (c) the Enterprise is also made up
> > of the Alabama court rooms of Defendant Judges which are controlled
> > by and for the accomplishment of Defendants' goals and goals of the
> > association in fact and have their own organizational structure; the
> > alternative definition of the Enterprise encompasses (a), (b), and/or (c)
> > or any combination as the Enterprise, and/or any one or more of (a),
> > (b), and/or (c) being the Enterprise which controls the other(s) as
> > operational divisions of the Enterprise.

*Id.* at 15-17 ¶ 22 (footnotes omitted; emphasis added). Plaintiff notes that

> > [t]he Hunting Club existed and initially operated legitimately as a
> > hunting club controlled by Defendants who were and are its sole
> > members prior to being converted into a RICO enterprise. See e.g.
> > Affidavit of Mr. Clements-Charles Gorham had hunted with Judge
> > Calhoun for over 20 years. Exhibit B-John Calhoun admitted
> > membership in the Hunting Club for many years before becoming a
> > judge.

*Id.* at 16 n. 12. So, what once was legitimate later became corrupted. And who controls the enterprise? Its

> organizational structure is controlled through the collaboration of Judge John C. Calhoun, Richard Fernambucq, Charles Gorham, Stephen Wright and others as to the domestic relations aspects of the Enterprise's operations, and by the Unknown Judge and Unknown Attorneys as to the criminal court aspects of the Enterprise's operations.

*Id.* at 17 ¶ 123.

To summarize the allegations thus far: A judge and his lawyer friends combined to form a RICO enterprise "maintained through the Hunting Club of which many Defendants … are members." *Id.* at 15-17 ¶ 22. Over time, others joined in, so that currently this enterprise extends to "the criminal court aspects of the Enterprise's operations." *Id.* at 17 ¶ 23.

Too, an unknown local criminal court judge and unknown attorneys associated with him "have likewise hunted with the Known Defendants . . . as part of the Hunting Club prior to the Unknown Judge becoming a Circuit Court Judge, Criminal Division; and the Unknown Judge and some or all of the Unknown lawyers were personal friends and practiced criminal law in" that court's circuit. *Id.* ¶ 15. The Enterprise later grew to include

> [o]ther Unknown Defendants[,] includ[ing] law firms, law partners, members, shareholders, and support staff of Known Defendants or of Unknown Defendant Attorneys engaged in the practice of law, and [it] may include corporate entities or other legally recognized entities such as partnerships or LLC's through which such persons are engaged in the practice of law.

*Id.* ¶ 16 (emphasis added).

The conspiracy also grew financially.  In 1998, the defendant attorneys used and invested additional illegal income from their Enterprise and leased a larger 2,700 acre tract of hunting land from International Paper Company for use of the Enterprise which they operated, conducted and controlled within the Hunting Club; leasing costs in excess of $27,000 per year were paid for solely by the ten lawyer members of the Hunting Club from their Enterprise profits, and neither Judge John C. Calhoun nor the Unknown Judge thereafter paid their share of any lease, entertainment, room & board, or operating costs for such judges' participation in the Hunting Club, thereby furthering the joint goals of the Enterprise by using money laundering.

*Id.* at 7-8 ¶ 14.

In ¶ 17, Blackburn identifies the precise source of "income" that fueled the "enterprise":

> Other Unknown Coconspirators and Aiders and Abettors are other unknown persons who were aware of the Enterprise through conversations at the Hunting Club and in the Defendant Judge's courtrooms, including its practices of granting inflated attorney's fees and agreeing through ex parte communications to more favorable results in cases of Defendant Attorneys, who benefitted from the Enterprise's wrongdoing, who maintained their silence, and who conspired to and did provide substantial assistance and the "cover" of legitimacy to the criminal Enterprise.

Id. ¶ 17 (footnotes omitted).

So, Blackburn maintains, corrupt judges threw cases and inflated attorney fee awards to fellow enterprise members, and those who benefitted provided substantial assistance and provided cover for such conduct. *Id.* Cash or tangible-goods based bribes are not alleged here, but rather in-kind and intangible transfers. In other words, judges were "paid" by having Hunting Club lawyers absorb the judges' Hunting Club membership costs-the judges were allowed to hunt gratis as "honorary members." *Id.* ¶ 27. And the benefitting attorneys would then stream some of their ill-gotten (attorney fee awards inflated by the judge) gains back to the judge in the form of campaign contributions to ensure his re-election.

*Blackburn v. Calhoun*, No. 207CV166, 2007 WL 850191, at *9-11 (N.D. Ala., March 4, 2008).

In a footnote, Judge Edenfield continued:

John Calhoun and Defendant hunting club lawyers convinced domestic relations lawyers on the Nominating Committee that if they nominated him, John Calhoun, in exchange, would increase their attorneys' fees. John Calhoun was nominated based on the understanding among all Defendants, including Nomination Committee lawyers, that [the] Defendant Judges' role in the Enterprise was to provide special favorable treatment to all Defendant Attorneys and their clients, including the fraudulent award of inflated attorneys' fees (fraud was in both unwarranted inflated fees and failure of attorney contracts to credit the fee to clients), especially in domestic relations matters. The Defendant Lawyers' role in the Enterprise was to thereafter "use and invest" illegal enterprise income, both as campaign contributions and otherwise, to elect and maintain the lucrative status of Defendant Judges as Jefferson County Circuit Court Judges in the State of Alabama.

18

Doc. # 31-2 at 17-19 ¶ 25 (footnotes omitted).

Calhoun, then, corruptly used his office to reward his lawyer-friends with favorable rulings and inflated fees awards. *Id.* ¶ 26. The benefitting attorneys would then kick back to the judge some of their ill-gotten (attorney fee awards inflated by the judge) gains in the form of campaign contributions to ensure his re-election, id. ¶¶ 25, 36(b) & (d), 50(b)(1), 50(c), 50(d), 50(f) and this directly harmed both plaintiff and other class members. *Id.* ¶ 42.

Inflated attorney fee awards from the judge was one benefit; intangible goodwill was another. One conspiracy member, defendant Fernambucq, allegedly bragged to a prospective client "that because he was in the same Hunting Club as John Calhoun, Calhoun would give him anything he asked." Id. ¶ 26(a). Thus, a "favorable judgment for [U.S. District Judge] Blackburn [who is the ex-wife of plaintiff Blackburn here] would advance the interests of the Enterprise by generating future referrals from a very visible client ." *Id.* ¶ 26(b).

*Blackburn*, 2007 WL 850191, at 11 n. 9.

In that case, as in the case before this court, Calhoun claimed judicial immunity. Judge Edenfield wrote:

When judges named as RICO defendants invoke judicial immunity, they are saying that the RICO claim is just another way of challenging the judge's adverse ruling in a case involving the RICO litigant. *See e.g., Hollis-Arrington* 205 Fed.Appx. at 52-53 (judicial immunity barred homeowners' RICO case against judicial defendants for making rulings unfavorable to homeowner; allegations all involved acts performed by the judges within scope of their judicial duties). Thus, RICO claims must be denied if they simply constitute another way of attacking a judge's rulings.

The immunity applies where the RICO-challenged acts are "judicial in nature." *Sisk v. U.S.*, 2007 WL 1963001 at * 3 (W .D.La.6/4/07) (unpublished) ("Here the acts alleged against Judge Sharp were judicial in nature and were not taken in the complete absence of subject matter jurisdiction. Judge Sharp is therefore entitled to the protection of absolute immunity for his acts"). That means that merely alleging criminal wrongdoing is not enough. *Sisk v. U.S.*, 2007 WL 1963000 at * 3 (W.D. La. 6/4/07) (unpublished) ("[A] judicial act does not become less judicial by virtue of an allegation of malice, corruption or conspiracy. . . . Neither does the fact that a RICO violation is alleged change the fact of judicial immunity"); *Yee v. Michigan Supreme Court*, 2007 WL 118931 at * 2 (E.D. Mich.1/10/07) (unpublished).

Blackburn therefore cannot overcome absolute judicial immunity by mere allegations of malice, "or corruption of motive." *Forrester v. White*, 484 U.S. 219, 227 (1988). Instead, he must allege facts showing that the judge was not acting in his judicial capacity, or that he acted in the complete absence of all jurisdiction. *Guttman*

19

*v. Khalsa*, 446 F.3d 1027, 1033-34 (10th Cir.2006). "A judge acting in his or her official capacity and performing a function normally performed by a judge, is not acting in the absence of all jurisdiction." *McDonald v. Heaton*, 2006 WL 1704604 at * 2 (W.D. Okla. 7/6/06) (unpublished)*; Stone v. Baum*, 409 F.Supp.2d 1164 (D.Ariz. 2005).

This is where Calhoun gets off Blackburn's liability train. Plaintiff at most has alleged that he acted with corrupt (bribed) motives when he ruled against him and his proposed co-plaintiffs. True, he has alleged that this defendant has done things off the bench like pal around with corrupt lawyers, soak up illicit "hunting club" (etc.) benefits-all to help foster an illegal enterprise.

But those allegations are all "quid-pro-quotied" to Calhoun's rulings. Meanwhile, it is settled that damage claims premised upon a judge's adjudicative (as opposed to, for example, administrative) duties are barred by judicial immunity. See, *e.g., Mireless v. Waco*, 502 U.S. 9, 12-13 (1991); *Forrester*, 484 U.S. at 225. And even the more liberal (Rooker-Feldman-wise) Seventh Circuit cases cited supra confer judicial immunity on judges alleged to have performed adjudicative acts whilst part of a corrupt cabal. *Davit*, 173 Fed.Appx at 518 (Former husband who brought RICO action against state court judges involved in his divorce proceeding could not circumvent the judicial immunity doctrine by enforcing RICO's criminal provisions through its civil enforcement provision); *Loubser* 440 F.3d at 442; see also Gordon, 2008 WL 495935 at * 1.

It is certainly possible to separately classify off-bench conduct (secret meetings at hunting lodges, etc., in furtherance of a RICO enterprise) in order to support a non-immune RICO claim in this context. However, public policy against flood-gate/disgruntlement RICO suits warrants the linkage applied here ( i.e., so long as the alleged actionable behavior-RICO or otherwise-is linked to judicial rulings, judicial immunity shall be applied). Hence, the Court grants defendant Calhoun's motion for summary judgment on these grounds, thus obviating the need to reach his other defenses.

*Blackburn*, 2007 WL 850191, at *21-22 (emphasis added).  On appeal, the Eleventh Circuit affirmed Judge Edenfield "for the reasons stated in the district court's order."  *Blackburn v. Calhoun,* 296 Fed. Appx. 788, (11th Cir. 2008).

Finally, the court finds no merit in the plaintiffs' claim that the motions before this court were untimely filed.

<u>CONCLUSION</u>

Based on the foregoing, the defendants' motions are due to be GRANTED, and this action is due to be dismissed. A separate order will be entered.

DONE this 8th day of June, 2010.

Robert R. Armstrong, Jr.
United States Magistrate Judge